(C. D. 1167)

ROYAL MANUFACTURING COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 25, 1949)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

OLIVER, Chief Judge: The merchandise herein consists of 75 bales of waste material imported from Canada and invoiced as rayon waste. An analysis of a sample of the merchandise, made by the United States Customs Laboratory, indicates that the sample was:

\* \* \* rayon waste having the following composition:

Rayon other than cellulose acetate_____ 89%
Rayon cellulose acetate_____ 11%
                                                          ‾‾‾‾‾
                                                          100%

The collector, holding that the merchandise at bar consisted of cellulose acetate waste commingled with rayon waste other than cellulose acetate, treated the shipment as commingled merchandise and by virtue of the segregation provisions of section 508, Tariff Act of 1930, subjecting commingled merchandise to the highest rate of duty applicable to any part thereof, assessed duty at 25 cents per pound under paragraph 31 (a) (1), Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, T. D. 49753, as "waste wholly or in chief value of cellulose acetate." Plaintiff claims the merchandise to be properly dutiable at 10 per centum ad valorem under paragraph 1302 of the same act as "Waste of rayon or other synthetic textile, except waste wholly or in chief value of cellulose acetate" or, if held to be commingled merchandise, that only 11.3 per centum

should be classified as rayon waste wholly or in chief value of cellulose acetate (paragraph 31 (a) (1)) and 88.7 per centum should be classified as rayon waste dutiable under paragraph 1302. Plaintiff further claims that the merchandise is dutiable as "waste, not specially provided for," at 7½ per centum ad valorem under paragraph 1555, as amended by the Canadian Trade Agreement, T. D. 49752.

At the trial Government counsel conceded that "the importation consisted of approximately 89% rayon made by the viscose method, and 11% rayon made by the acetate method, and that the value of the rayon made by the viscose method was greater than the value of the rayon made by the cellulose-acetate method" (R. 5) "because of the quantity" (R. 6). Except for this concession, the record consists of the testimony of three witnesses all called by the plaintiff. No testimony was introduced by defendant in support of the collector's classification.

A duly qualified textile analyst at the United States Customs Laboratory at the port of New York testified that an analysis of a sample of the merchandise which he described as "a mass of torn yarns, broken yarns, and so forth" consisting of threads and filaments, indicated that it contained 88.7 per centum by weight of regenerated cellulose or viscose rayon and 11.3 per centum cellulose acetate by weight. The witness stated that "the three major rayons are viscose, cuprammonium, and acetate" (R. 8), all of which are made from cellulose and that the only difference between them is that in the case of viscose and cuprammonium the wood pulp is put through an alkali treatment, whereas in producing acetate rayon an acid treatment is used. All three are known in the trade as rayons. On cross-examination the witness stated that the quantity of rayon acetate and the quantity of rayon cellulose made by the viscose process in an importation could be determined by a physical separation of the fibers after they are dyed but that it would be "a long, tedious process" (R. 11) and that such separation could not be accomplished with a bale of waste inside of 6 months.

The exporter of the shipment in question, who has bought and sold wastes for over 25 years, stated that the merchandise herein consists of machine threads and filaments which drop to the floor in the process of manufacture and are then swept up and put in bags and cartons. He stated that it would not have been possible to separate the cellulose acetate from the viscose rayon in this shipment (R. 27).

A sample illustrating the type of merchandise at bar which the treasurer of the plaintiff company testified was "a low grade of rayon crepe waste" was introduced in evidence as plaintiff's illustrative exhibit A (R. 31). This witness stated that his company merely used such merchandise as a cheapener or ingredient in wiping waste and

that when a shipment of waste such as represented by illustrative exhibit A is received no attempt is made to separate the cellulose acetate rayon. He further stated that he knew of no way in which the cellulose acetate content in such a shipment could be separated.

On the foregoing record the importer contends that as the merchandise is admittedly rayon waste and as it is concededly not waste wholly or in chief value of cellulose acetate, it is specifically provided for in paragraph 1302 of the tariff act and that it is not subject to the commingling provisions of section 508 nor is it subject to the provisions of paragraph 31 (a) (1) for "waste wholly or in chief value of cellulose acetate."

The provision in paragraph 31 (a) (1) for "waste wholly or in chief value of cellulose acetate" appeared for the first time in the Tariff Act of 1930. As passed by the House of Representatives, paragraph 31 (a) (1) of H. R. 2667, which later became the Tariff Act of 1930, provided for waste in the following language—"cellulose acetate rayon waste and other cellulose acetate waste." The Senate Committee on Finance deleted the House provision and substituted in lieu thereof the provision as it now appears in paragraph 31 (a) (1), *supra*, to wit, "waste wholly or in chief value of cellulose acetate" (Amendment No. 69), and reported to the Senate (Report No. 37, page 5) as follows:

The phrase "cellulose acetate rayon waste and other cellulose acetate waste" was stricken out of the House bill and "waste wholly or in chief value of cellulose acetate" inserted in lieu thereof. The new language is intended to cover the cellulose acetate waste resulting from the manufacture of blocks, sheets, rods, and other forms as well as from the manufacture of the above forms into finished articles. In addition, it is intended to cover the waste filaments, fibers, and yarns from cellulose acetate artificial silk.

The Senate adopted the committee's amendment, and relative to that amendment, the conferees representing the House of Representatives advised acceptance of the Senate amendment, and in conference Report No. 1326, page 36 (71st Congress, 2d Sess.), reported as follows:

Amendment No. 69: This amendment is a clarifying amendment to make certain that the rate provided will apply to all waste wholly or in chief value of cellulose acetate; and the House recedes.

In a document compiled by the United States Tariff Commission, entitled "Supplement to Tariff Information on Items in Tariff Bill of 1930 (H. R. 2667), Subject to Conference," at page 32, the Commission stated as follows:

The three commercial methods for making rayon or artificial silk are known as viscose, cuprammonium, and nitrocellulose processes. The resulting filament or fiber from all of these processes is a regenerated cellulose. A separate and

distinct type of artificial silk or fiber is composed of cellulose acetate, that is, a chemical combination of acetic acid and cellulose, chemically known as an ester. Cellulose acetate, in addition to its use in the manufacture of artificial fibers, has extensive application in the manufacture of films, plastics, and to some extent, in lacquers.  *  *  *

*        *        *        *        *        *        *

The cellulose acetate is the raw material for (1) the artificial silk industry and (2) the plastic, film, and lacquer industries.

The waste filaments of .fibers of cellulose acetate serve the same purpose as cellulose acetate powder or other forms which are dutiable under paragraph 31 as cellulose acetate, and are directly competitive with it.

The *waste filaments and fibers* from the *viscose, cuprammonium, and nitrocellulose processes* are of small value as compared with the *cellulose acetate waste filaments and fibers.* [Italics supplied.]

In enacting the provision for "waste wholly or in chief value of cellulose acetate," Congress intended to protect the industry engaged in using cellulose acetate powder and other forms of cellulose acetate, provided for in paragraph 31, and with which waste filaments of fibers of cellulose acetate are competitive.  It seems apparent from the foregoing legislative history that it was the intention of Congress to place in paragraph 31 (a) (1) the waste filaments and fibers composed wholly or in chief value of cellulose acetate and to have paragraph 1302 cover the waste filaments and fibers from the viscose, cuprammonium, and nitrocellulose processes or from the cellulose acetate process except such waste as is "wholly or in chief value of cellulose acetate."

The merchandise herein was classified under the provisions of paragraph 31 (a) (1) by virtue of the provisions of section 508 of the tariff act relative to the commingling of goods.  Such classification was made pursuant to the decision of our appellate court in *United States* v. *M. S. Cowen & Co.,* 32 C. C. P. A. (Customs) 40, C. A. D. 283. That case concerned an importation of 50,000 pounds of shelled peanuts from the Philippine Islands, a portion of which consisted of peanuts from Java to the value of about 15 per centum of the total. Philippine-grown peanuts which do not contain foreign materials in excess of 20 per centum are entitled to free entry under section 301, Tariff Act of 1930, as articles the growth or product of the Philippine Islands, and Java-grown peanuts are subject to duty under paragraph 759 of the same act as "Peanuts, not shelled  *  *  *  7 cents per pound."  The collector treated the merchandise as commingled goods and classified it under the dutiable paragraph of the tariff act.  His action was not sustained by the trial court.  The record indicated that in order to determine the relative percentages of each commodity it would have been necessary "to separate each peanut from the other" and that it would have required 15 to 30 minutes in order to segregate

5 pounds of peanuts. Our appellate court affirmed the action of the collector and held the merchandise to be commingled goods and properly dutiable as assessed. In doing so, the court held that every individual peanut was not the growth or product of the Philippine Islands and that by mixing the peanuts in bags, or otherwise, the mixture did not thereby become the growth or product of the Philippine Islands within the meaning of the statute. It further denied the plaintiff's claim that duty should have been assessed only on those peanuts grown in Java and that the Philippine-grown peanuts were entitled to free duty. The *Cowen* case, *supra*, is not controlling in the present case. Here there was no commingled merchandise as that term is contemplated by the provisions of section 508 of the Tariff Act of 1930. Rayon waste may or may not contain cellulose acetate by reason of its very nature and still be embraced by the two paragraphs in question. Paragraph 31 (a) (1) contemplates a waste which may be used for any purpose for which the original cellulose acetate is applicable. The merchandise in question is rayon waste, bought, sold, and invoiced as such, and in chief value of something other than cellulose acetate. It consists of machine threads and filaments which drop to the floor in the process of manufacture "a low grade of rayon crepe waste," used as a "cheapener or ingredient in wiping waste." While it contains a percentage of cellulose acetate waste, it is not the kind of cellulose acetate waste that Congress intended to be classifiable under said paragraph 31 (a) (1). Hence, the provisions of the tariff act relating to commingled merchandise have no application.

The record herein indicates that the cellulose acetate contained in the shipment before us could not readily be separated. The witness Fielding; a Government textile analyst, testified that the manual method of separation would be a "long, tedious process." He further stated that in the laboratory method of distinguishing rayon viscose from rayon acetate, which he described, the rayon acetate is entirely destroyed and only the regenerated cellulose, i. e., rayon other than cellulose acetate, remains (R. 9). It appears, therefore, that the amount of cellulose acetate contained in the rayon waste involved could not be used as is the type of waste embraced in paragraph 31, which latter waste is capable of reuse.

As originally proposed, paragraph 1302 provided for "Rayon waste, except cellulose acetate rayon waste." As finally adopted, the provision provided for "Waste of rayon or other synthetic textile, except waste wholly or in chief value of cellulose acetate." The hearings before the Senate Finance Committee indicate that the word "rayon" in the proposed bill was supplemented by the addition of the words "or other synthetic textile" because it was thought that the word "rayon" alone was too general to describe all synthetic textiles and it was

thought necessary to add these words to include synthetic textile products other than rayon. If the Congress intended that no amount of cellulose acetate waste was to be embraced within the provisions of paragraph 1302, we are of the opinion that it would have indicated such intent by a definite exclusion as originally proposed. Since it did not do so, it would appear that the paragraph embraces a waste which may contain a certain amount of cellulose acetate.

Rayon waste is *eo nomine* provided for in paragraph 1302 which covers all rayon waste except such as is "wholly or in chief value of celulose acetate." By such language it would appear that the Congress contemplated rayon waste in which more than one type of rayon might be included. It is equally clear that waste wholly or in chief value of cellulose acetate is excluded from the provisions of paragraph 1302 and becomes dutiable under the provisions of paragraph 31 (a) (1) which *eo nomine* provides for such waste. Congress contemplated rayon waste which might contain no cellulose acetate or a waste which might include some of the cellulose acetate type or a waste which was in chief value of cellulose acetate. If, as here, the waste in the condition as imported is admittedly rayon waste and it is conceded that it is *not* in chief value of cellulose acetate, it is provided for in paragraph 1302 as claimed. There is no need for the plaintiff herein to establish uniformity of packing as it is conceded by Government counsel (R. 5) that *"the importation consisted of approximately 89% rayon made by the viscose method, and 11% made by the acetate method, and that the value of the rayon made by the viscose method was greater than the value of the rayon made by the cellulose-acetate method."* [Italics supplied.] The actual figures as testified to by the Government chemist were 88.7 per centum viscose rayon and 11.3 per centum cellulose acetate. The entire shipment consisted of rayon waste which is *eo nomine* provided for in paragraph 1302. As we are of opinion that the merchandise as imported was not commingled merchandise and, therefore, not subject to the provisions of section 508, we do not here pass upon the question of whether or not the method employed to ascertain the percentages of viscose and cellulose acetate rayon in this shipment is or is not a simple or universally recognized test.

For the reasons set forth herein and upon the record here before us, we find the imported merchandise to be waste of rayon not wholly or in chief value of cellulose acetate and dutiable under the provisions of paragraph 1302, Tariff Act of 1930, at 10 per centum ad valorem as claimed.

Judgment will be entered accordingly.